*Decision will be entered under Rule 50.*

MIRIAM COWARD PIERSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket. No. 55976. Filed November 26, 1956.

*Benjamin Alpert, Esq.*, for the petitioner.
*Norman A. Peil, Jr., Esq.*, for the respondent.

FINDINGS OF FACT AND OPINION.

TIETJENS, *Judge:* The Commissioner determined deficiencies in the petitioner's income tax as follows:

| Year | Deficiency |
| --- | --- |
| 1944 | $44,799.17 |
| 1945 | 13.12 |

Certain adjustments made by the Commissioner are not contested by the petitioner. There are three issues for decision. The first involves the question of whether gain or loss was realized by the petitioner when she received certain assets from a trust in settlement of an inherited remainder interest in the trust; the second involves the determination of the petitioner's basis in those assets; and third, whether the petitioner sustained a deductible loss when she canceled certain notes owed her by a corporation controlled by her former husband. The income tax returns for the years involved herein were filed with the then collector of internal revenue for the fifth district of New Jersey.

### *Issues 1 and 2.*

All of the facts bearing on these issues are stipulated and are so found. For convenience they may be summarized as follows:

During his lifetime the petitioner's grandfather, James S. Coward, created two trusts for the benefit of his daughter, Hattie, the corpora of which consisted of bonds and mortgages. The income was payable to Hattie during her life. At her death the corpus of each was to revert to James, if living, and in the event he predeceased Hattie, the trusts were to become part of his residuary estate to be disposed of according to his will.

James died March 11, 1923, while Hattie was still living. His will continued the trusts and provided that upon Hattie's death the trust funds were to be distributed $500,000 each to Hattie's three children and the remainder to his son, John, the petitioner's father.

John died December 9, 1925. By will he left one-half of his remainder interest in the trusts to his wife, Minnie, and one-half to the petitioner. At the time of his death, John's interest in the trusts was valued at $1,300,000.

Minnie died March 30, 1940, and by will left her one-half remainder interest in the trust funds to her daughter, the petitioner. At Minnie's death this one-half interest was valued at $50,000.

The life tenant, Hattie, died September 15, 1941. On that date the trust funds were not sufficient to pay the amounts required to liquidate obligations due the life tenant and remaindermen in full (exclusive of the petitioner).

Litigation in connection with the trusts had been pending for many years based upon exceptions which had been filed to the account of the trustee. Such exceptions in part charged that the trustee had mismanaged the trust investments. This litigation was ultimately settled through the medium of a consent decree. In substance, the decree directed a settlement of all matters in controversy and provided for the payment to the petitioner of $62,500 in cash and 9 specified pieces of real estate. The petitioner received, in addition, the sum of $28,865.77, which amount was paid by the trustee. The petitioner paid legal fees of $30,000 in connection with this litigation.

The 9 properties distributed to the petitioner had been acquired by the trusts between 1932 and 1941 as a result of foreclosure of mortgages held by the trusts. Their market value at the time of acquisition by the trusts is stipulated.

On her 1944 income tax return the petitioner reported a loss on the settlement of her remainder interests in the James S. Coward Trusts in the amount of $449,988.02, computed as follows:

| | | |
|---|---:|---:|
| Basis in trust | | $700,000.00 |
| Legal expenses incurred in connection with settlement of trust | 30,000.00 | $730,000.00 |
| Less: | | |
| Cash received | $ 91,365.77 | |
| Fair market value of 9 parcels of real property | 144,500.00 | 235,865.77 |
| Loss on settlement of trust | | $494,134.23 |

The petitioner sold 2 of the 9 parcels of real estate in 1944. She sold the other 7 in 1945. On her income tax returns for those years she reported gain or loss from their sale as follows:

| | Date sold | Selling price | Cost | Expenses and depreciation | Net gain (or loss) |
|---|---|---|---|---|---|
| 325–34th St | 1944 | $20,000.00 | $20,000.00 | $312.50 | ($312.50) |
| 118–66th St | 1944 | 6,250.00 | 6,000.00 | | 250.00 |
| Net gain (or loss)—1944 | | | | | (62.50) |
| 100–58th St | Feb. 14, 1945 | 10,682.14 | 12,000.00 | 1,245.94 | (2,081.58) |
| 116–66th St | Feb. 27, 1945 | 6,742.28 | 6,500.00 | 788.23 | 4.03 |
| 5222 Bergenline Ave | June 14, 1945 | 9,236.30 | 9,000.00 | 849.59 | (193.91) |
| 6114 Highland Ave | Feb. 14, 1945 | 45,472.24 | 45,000.00 | 3,616.58 | (1,849.42) |
| 726–11th St | Aug. 9, 1945 | 6,191.18 | 6,000.00 | 655.00 | (23.82) |
| 803–27th St | Feb. 1, 1945 | 40,389.12 | 25,000.00 | 3,241.42 | 12,895.30 |
| 1700 Summit Ave | Apr. 26, 1945 | 9,049.36 | 15,000.00 | 1,374.65 | (5,685.95) |
| Gladden Hall Apts | Feb. 1, 1945 | 136,983.18 | 215,119.05 | 57,192.06 | [1] (46,910.17) |
| Sundry expenses | | | | 3,782.24 | (3,782.24) |
| Net gain (or loss)—1945 | | | | | (47,627.76) |

[1] Per return.

The first question for decision arises because the Commissioner determined that the deduction of $494,134.23 claimed by the petitioner on her 1944 return as a loss on settlement of the trusts was not allowable, inasmuch as the claimed loss constituted merely a shrinkage in value of properties in the hands of the trustee prior to acquisition by the petitioner.

The petitioner contends that the receipt by her of the 9 parcels of real estate and cash in liquidation of her remainder interests was a taxable event upon which ordinary gain or loss was realized. The Commissioner, on the other hand, argues that such receipt was not a taxable event since there was not a "sale or other disposition" by the petitioner of her remainder interests within the meaning of section 111 (a) of the Internal Revenue Code of 1939.[1]

In our view, *Estate of Edith M. Findlay*, 46 B. T. A. 1214 (1942), disposes of this issue in favor of the Commissioner. In that case, the taxpayer's decedent was one of the beneficiaries of an estate. The value of the decedent's share of such estate at her death was greater than was the value when distribution was made to her executor, the taxpayer, some 4 months after the decedent's death. The amount of the decrease in value was claimed by the taxpayer as a deductible loss upon liquidation of the estate. We held that the loss was not deductible since there had not been a disposition.

We cannot see a disposition in this case either. So far as the record discloses here the trustee did nothing more than segregate those assets which constituted the inherited remainder interests and distribute them to the petitioner. In other words, the petitioner received under the court's decree the equivalent of her distributive share in the remainder and this is not a taxable event, despite the fact that the value of the property thus received was, at the time of receipt, less than the

[1] SEC. 111. DETERMINATION OF AMOUNT OF, AND RECOGNITION OF, GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 113 (b) for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

amount at which the remainder was valued at the time of John's death and Minnie's death. We fail to perceive anything more than a fluctuation in the meantime value of the petitioner's share. This does not give rise to a deductible loss. *Estate of Edith M. Findlay*, *supra*.

The second issue revolves around the basis used by the Commissioner in determining gains or losses on the sale by the petitioner of the parcels of real estate which she received from the trustee. In his determination with reference to the one-half interest which the petitioner received from her mother, the Commissioner used the fair market value at the date of the mother's death, namely $50,000, relying on section 113 (a) (5) of the Internal Revenue Code of 1939 which provides that property acquired by gift, devise, or inheritance shall have as its basis for computing gain or loss the fair market value of said property at decedent's date of death. As we understand the petitioner's argument, the first issue having been decided against her, there is no substantial quarrel in this respect.

With reference to the one-half interest which the petitioner had received from her father, the Commissioner used in his determination the basis of the property in the hands of the trustee rather than the $650,000 (one-half of the $1,300,000) value placed upon the property when the petitioner first acquired that interest under the will of her father in 1925. (Here it should be pointed out that the properties ultimately distributed by the trustee to the petitioner were not the same properties held by the trust at the time of the father's death. This is not crystal clear from the stipulated facts where it is simply stipulated:

The properties received by the petitioner at the time of conveyance in 1944 were acquired by the trusts between 1932 and 1941 as a result of foreclosure of mortgages held by the trusts. Exhibit 3C annexed hereto and made a part hereof sets forth the fair market values of such properties when acquired by the trusts in foreclosure proceedings.

But that this is the case is abundantly clear from the briefs and from the statements of counsel. For instance counsel for petitioner said in his opening statement:

ultimately the trust consisted of only properties acquired as a result of foreclosure of the various mortgages originally bequeathed by the testator grantor, grandfather, or acquired by the trustee in exchange, but for ordinary purposes we know that the trust corpora consisted only of properties which had a new cost basis to the trust, namely, the acquisition cost to the trust and did not relate back to the acquisition from the decedent because it was different property It was not the same property which they had acquired from the testator.

Again, on brief, petitioner's counsel states:

In the present situation the assets which the trust ultimately distributed to the petitioner were not those which had originally been acquired from the

testator-settlor but were assets which had been acquired by the trust in taxable transactions subsequent to the formation of the trust.)

The Commissioner grounds the use of the trustee's basis in the properties upon the cases of *Helvering* v. *Reynolds*, 313 U. S. 428, and *Maguire* v. *Commissioner*, 313 U. S. 1. Those cases held that where the properties distributed by a trustee to the remainderman upon death of the life tenant consisted both of property that had been received by the trustee from the decedent's estate and of other property thereafter purchased by the trustee, the purchased property was not acquired by the remainderman by bequest, devise, or inheritance within the meaning of section 113 (a) (5) and that, therefore, its basis in the hands of the remainderman was not its fair market value at the date of death of the decedent, but rather the "cost" to the trustee.

We think the Commissioner's use of the trustee's basis for the property coming to the petitioner from her father is correct. The only distinction that can be made between the situation here and that dealt with in the *Reynolds* and *Maguire* cases, *supra*, is that here the taxpayer is the beneficiary of the remainderman, and in the other cases, the taxpayer was the original remainderman. We do not see how this fact can call for any different result, though, to be sure, no decided cases dealing with such a distinction have been found. In our view, so far as basis is concerned, the remainderman's beneficiary (the taxpayer here) simply steps into the shoes of the remainderman.

The petitioner also argues that there should be uniformity in the bases used both for the interests acquired by the petitioner through her mother and through her father. However, we think the difference in treatment is necessary. In the case of the interest coming from her mother, the property distributed to the petitioner by the trustees was identical with the property in the hands of the trustees at the time of the mother's death. As pointed out above, not so with respect to the properties coming through the father. This calls for use of the trustee's basis for the latter properties under the rule of the *Reynolds* and *Maguire* cases, but does not call for the use of that basis for the interest coming through the mother which came by devise or inheritance and thus is governed by section 113 (a) (5).

We approve the Commissioner's determination of gain or loss as set forth in the stipulation of facts.

### Issue 3.

#### FINDINGS OF FACT.

Some of the facts have been stipulated and are so found.

Bondex, Inc. (hereafter called Bondex), was incorporated in New York in 1936 for the purpose of rendering investment counsel service.

It acquired the stock of Bondex, Inc., an Illinois corporation. The stock of the Illinois corporation was then canceled and the corporation dissolved. Upon dissolution, the goodwill account on the books of Bondex was increased by $35,000.

The petitioner made advances to Bondex of various amounts from 1937 to 1943, resulting in a total due her of $92,350. She received from Bondex demand notes as evidence of the corporation's indebtedness to her as follows:

| | | | |
|---|---|---|---|
| Nov. 10, 1937 | $3,000 | Nov. 17, 1938 | $5,000 |
| Nov. 29, 1937 | 3,000 | Dec. 16, 1938 | 3,000 |
| Dec. 18, 1937 | 3,000 | Apr. 28, 1939 | 2,000 |
| Dec. 30, 1937 | 2,500 | May 12, 1939 | 3,000 |
| Feb. 4, 1938 | 4,000 | June 15, 1939 | 1,500 |
| Mar. 29, 1938 | 5,000 | Sept. 15, 1939 | 1,500 |
| Apr. 28, 1938 | 3,000 | June 5, 1940 | 3,000 |
| June 15, 1938 | 5,000 | Dec. 31, 1942 | 1,250 |
| June 28, 1938 | 3,000 | May 4, 1943 | 2,000 |
| Aug. 15, 1938 | 2,500 | June 9, 1943 | 1,500 |
| Sept. 15, 1938 | 2,100 | Aug. 4, 1943 | 1,000 |
| Sept. 29, 1938 | 2,500 | Aug. 24, 1943 | 1,000 |
| Oct. 31, 1938 | 3,000 | Dec. 31, 1943 | 25,000 |

The bulk of the moneys advanced by the petitioner was used to conduct extensive research which was necessary for the successful operation of the investment advisory service of Bondex.

The petitioner was married to Ernest Rice during the years 1937 through 1944 and was divorced from him on June 13, 1944. Ernest was the controlling stockholder of Bondex during the above period.

The petitioner became a director of Bondex on June 19, 1940. On August 19, 1941, she was designated as one of four persons authorized to cosign checks of the corporation. She acquired 1 share of the corporation's stock on November 23, 1942, and transferred it to Ernest on November 6, 1944.

The petitioner and Ernest entered into a property settlement, dated April 17, 1944, which provided *inter alia* that:

(a) Petitioner resign as a director of Bondex, Inc.

(b) She endorse in blank and transfer to Ernest H. Rice her qualifying share of her stock in Bondex, Inc.

(c) Ernest H. Rice's debt in the amount of $50,000 due to the estate of petitioner's mother be cancelled.

(d) Ernest H. Rice was to return to petitioner her demand notes against Bondex, Inc. in the amount of $92,350 as listed in Exhibit C of the property settlement aforesaid.

(e) A general release on the part of the parties.

In March 1944, petitioner's legal representatives prepared a summons and complaint, which was not served, demanding judgment against Bondex in the sum of $92,350. After protracted negotiations, the petitioner received $2,500 from Bondex on August 15, 1944.

Upon the settlement of said notes, Bondex made the following surplus adjustments on its books:

(1)

| | |
|---|---|
| Stated value no-par stock reduced | $55,000.00 |
| Note payable canceled | 89,850.00 |
| Accrued interest on note payable canceled | 26,274.74 |
| Surplus | $171,124.74 |

(2)

| | |
|---|---|
| Surplus | 32,582.24 |
| Note receivable canceled | 2,860.46 |
| Employees' advances canceled | 29,476.93 |
| Advances canceled | 20.34 |
| Deposit | 224.51 |

The balance sheets of Bondex showed deficits as follows:

| Date | Deficit | Date | Deficit |
|---|---|---|---|
| Apr. 30, 1937 | $8,361.19 | Feb. 28, 1941 | $102,440.27 |
| Feb. 28, 1938 | 43,415.38 | Feb. 28, 1942 | 116,117.64 |
| Feb. 28, 1939 | 73,541.38 | Feb. 28, 1943 | 131,690.73 |
| Feb. 29, 1940 | 95,043.37 | Feb. 29, 1944 | 139,308.38 |

The balance sheets of Bondex at February 29, 1944, and February 28, 1945, were as follows:

| | Feb. 29, 1944 | Feb. 28, 1945 |
|---|---|---|
| Assets: | | |
| Cash | $6,593.50 | $7,750.94 |
| Accounts receivable—customers | 1,975.67 | 3,015.83 |
| Accounts receivable—officers and employees | 6,006.74 | |
| Advances to Industrial and Estate Plan Dept | 10,896.58 | 10,896.58 |
| Notes receivable (H. A. Mueller) | 2,860.46 | |
| Fixed assets (less depreciation) | 3,552.53 | 2,566.15 |
| Leasehold improvements | 691.78 | |
| Prepaid expenses | 4,965.86 | 4,949.34 |
| Sundry deposits | 224.51 | |
| Inactive salesmen's accounts | 23,470.19 | |
| Organization expense | 5,068.59 | 5,068.59 |
| Goodwill | 44,911.98 | 44,911.98 |
| Total | $111,218.39 | $75,159.41 |
| Liabilities and capital: | | |
| Accounts payable | $407.61 | $400.02 |
| Notes payable (Ernest Rice and Miriam Rice) | 127,550.00 | 28,200.00 |
| Accrued taxes | 557.62 | |
| Accrued expense | | 7,919.26 |
| Accrued interest | 32,945.18 | |
| Employees' bond subscription | 15.00 | 26.35 |
| Office bond | 3.85 | |
| Reserve for unearned revenue | 14,047.51 | 18,290.21 |
| Capital stock | 75,000.00 | 20,000.00 |
| Surplus | (139,308.38) | 4,323.57 |
| Total | $111,218.39 | $75,159.41 |

The account "Reserve for Unearned Revenue" represents advance payments by customers for services to be rendered in the future by

Bondex. The moneys received from such customers, which gave rise to the reserve, were not subject to any restrictions as to use and were general corporate funds.

OPINION.

The third issue involves the question of whether the petitioner sustained a nonbusiness bad debt in 1944 when she canceled notes of Bondex, with a face value of $92,350, for $2,500 cash. (It is stipulated that in the event the petitioner is deemed to have sustained a loss in the Bondex transactions it is deductible as a short-term capital loss under the provisions of section 23 (k) (4).) The Commissioner contends that the loss was not sustained in 1944 since the debt was worthless prior to that year. Alternatively he argues that compromising the debt in 1944 was not in settlement of the liability of Bondex to the petitioner but was in reality a part of a marital property settlement between the petitioner and her former husband.

To substantiate his position that the debt was worthless prior to 1944, the Commissioner relies on the following: That when the petitioner began making advances in 1937, Bondex had capital stock of $75,000 and a deficit of over $8,300, and this deficit increased each and every year thereafter until it was more than $139,000 in 1944, during all of which time the petitioner's advances continued; that Bondex during this period expended large sums of money in research from which it obtained no tangible assets; that more than $93,000 of Bondex's book value assets (which totaled less than $112,000) were without value and among its liabilities in 1944 there was over $14,000 of unearned income; and that petitioner's advances had no value when created since they were expended in salaries and other intangible components of research which had only a highly questionable potential value.

The Commissioner's argument is without merit. It is well settled that debts may not be deducted as bad debts unless they had value when acquired or created. *Eckert* v. *Burnet*, 283 U. S. 140 (1931). Also, a nonbusiness bad debt is not deductible unless it becomes totally worthless within the taxable year. Partial worthlessness is not sufficient. Sec. 23 (k) (4), I. R. C. 1939, and Regs. 111, sec. 29.23 (k)–6. We think that the advances made by the petitioner to Bondex were debts that had value when they were created. During this time Bondex had capital stock of $75,000 and was conducting research which gave it much valuable knowledge on certain types of investments. It had a great potential earning capacity. The balance sheets of Bondex also indicated that it always had sufficient cash to pay a portion of its indebtedness. In our opinion the notes of Bondex held by the petitioner did not become totally worthless prior to 1944. That Bondex was insolvent during the years 1937 through 1944 does not

mean that the petitioner's notes were worthless. See *Trinco Industries, Inc.*, 22 T. C. 959 (1954). Insolvency, standing alone, means no more than that the account was probably uncollectible in part. *Higginbotham-Bailey-Logan Co.*, 8 B. T. A. 566 (1927). Bondex was a going concern in 1944 and prior years; it had not ceased rendering investment counsel services; thus a potential ability to pay some of its debts was always present, which gave value to the petitioner's notes. See *City National Bank*, 11 B. T. A. 857 (1928). Hindsight lends strength to this conclusion, for the petitioner's former husband, Ernest Rice, testified that subsequent to 1944, he received payment in full for the Bondex notes which he held.

The Commissioner's second contention, that compromising the debt in 1944 was not in settlement of the liability of Bondex to the petitioner but was in reality a part of a marital property settlement between the petitioner and her former husband, Ernest, is also without merit. In March 1944, the petitioner's legal representatives prepared a summons and complaint demanding judgment against Bondex, in the amount of $92,350. However, the summons and complaint were never served, the reason evidently being that it would bankrupt Bondex and the petitioner probably decided that she could realize more on her notes if she made a settlement than if she sued Bondex. Accordingly in August 1944, her attorneys effected the compromise between Bondex and the petitioner. Meantime, on June 13, 1944, the petitioner received a divorce from Ernest. The divorce decree incorporated a separation agreement which those parties had executed on April 17, 1944. The separation agreement adjusted the various property rights of the parties, based on their interests in the various properties. Among other things it required that Ernest deliver to petitioner her demand notes against Bondex, in the amount of $92,350. Thus during 1944 the petitioner was no longer in a position to readily ascertain the activities of Bondex. She lost interest in its operations as well as her confidence in its ultimate success. These factors prompted the petitioner to compromise the demand notes she held. In view of these circumstances, we are of the opinion that the transaction between the petitioner and Bondex was one at arm's length and that the petitioner exercised sound business judgment in compromising the debt at that time for $2,500.

We hold that the petitioner sustained a nonbusiness bad debt loss in the amount claimed when she canceled her Bondex notes with a face value of $92,500 for $2,500 cash in the year 1944. So far as petitioner is concerned that closed the transaction.

*Decision will be entered under Rule 50.*